UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

PETER PAPPAS, Individually and On Behalf
of All Others Similarly Situated,

               Plaintiff,

   vs.

LIGHTSPEED COMMERCE INC. (f/k/a
LIGHTSPEED POS INC.), DAX DASILVA,
and BRANDON NUSSEY,

               Defendants.

———————————————————— x

:  Civil Action No. 1:21-cv-10304
:
:  <u>CLASS ACTION</u>
:
:  COMPLAINT FOR VIOLATION OF THE
:  FEDERAL SECURITIES LAWS
:
:
:
:
:
:
:
:  <u>DEMAND FOR JURY TRIAL</u>

Plaintiff, Peter Pappas ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the U.S. Securities and Exchange Commission ("SEC") filings by Lightspeed Commerce, Inc. ("Lightspeed Commerce, " "LSPD," or the "Company"), Company press releases, conference call transcripts and media reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.      This is a securities class action on behalf of all persons who purchased or otherwise acquired Lightspeed Commerce subordinate voting shares ("common stock") between September 11, 2020 and November 3, 2021, inclusive (the "Class Period"), against Lightspeed Commerce and certain of its officers for violations of the Securities Exchange Act of 1934 ("1934 Act").

2.      Lightspeed Commerce, f/k/a Lightspeed POS Inc., is an international point-of-sale and e-commerce software provider based in Montreal, Quebec, Canada, with operations throughout the U.S..  It was founded by in 2005 by Defendant Dax Dasilva ("Dasilva") who currently serves as its Chief Executive Officer ("CEO").

3.      On September 15, 2020, the Company announced the closing of its U.S. initial public offering ("IPO") and listing on the New York Stock Exchange ("NYSE") of 10,896,196 shares of its common stock, by which it received proceeds of approximately $332.3 million.  A secondary sale of 2,142,808 shares by certain selling shareholders was also completed that same day for gross proceeds of $65.4 million.

4.    Throughout the Class Period, Defendants issued materially false and misleading statements regarding the Company's business metrics and financial prospects causing Lightspeed Commerce common stock to trade at artificially-inflated prices, reaching a Class Period high of more than $130 per share by September 22, 2021.

5.    As alleged herein, Defendants made the following materially false and misleading statements and/or failed to disclose the following material information during the Class Period:

(a)    that Lightspeed Commerce had overstated its pre-IPO business metrics and financial prospects by overstating its true customer count by 85%;

(b)    that Lightspeed Commerce had overstated its pre-IPO business metrics and financial prospects by overstating its true gross transaction volume ("GTV") – a payment volume metric that a former employee describes as "smoke and mirrors" – by 10%;

(c)    that Lightspeed Commerce was then overstating its business metrics and financial prospects by concealing declining organic growth and ongoing business deterioration;

(d)    that Lightspeed Commerce was then overstating its business metrics and financial prospects by claiming that its Average Revenue Per User ("ARPU") was increasing;

(e)    that Lightspeed Commerce had undertaken an acquisition spree at escalating costs with no clear path to profitability, while its management pursued aggressive revenue reporting practices; and

(f)    that Defendants had been operating the Company with defective internal controls and ineffective oversight of its accounting practices by its outside audit firm.

6.    On September 29, 2021, during the trading day, research firm Spruce Point Capital Management published a report (also summarized in a press release issued by the firm that day) based on its own extensive research into non-public information that was highly critical of

Lightspeed Commerce's true business metrics and financial prospects (the "Spruce Point Report"), including "comments from a former payments employee who revealed that the Company's [GTV] metric [was] 'Smoke And Mirrors' and 'Not Verified Payments."  Instead, "[a]fter conducting a forensic financial and accounting review," the Spruce Point Report characterized Lightspeed Commerce as "a cash degenerative North American roll-up of point-of-sale commerce solutions" that "covered up massive inflation of its Total Addressable Market (TAM), customer counts, and [GTV]."  Spruce Point further proffered in its report that Lightspeed had been "covering up increasing competitive pressures and double digit organic declines in its business with a flurry of acquisitions."  The Spruce Point Report went on to state that "[g]iven numerous changes to the definition of its [ARPU], its resilience to revenue loss and improvement in DSOs during peak COVID-19 while its restaurant and retail clients were pressured, and subtle accounting changes," Spruce Point "question[ed] [the Company's] revenue quality."

7.     The Report further emphasized how "[i]nitially [Lightspeed Commerce] guided investors to its cash from operations . . . as the best way to measure its performance, and then quietly suspended guidance," adding that "[b]ased on employee interviews, we believe its ARPU has actually been declining, not all acquisitions have been successful, and it appears [the Company] is gaming its goodwill testing to avoid impairment."  It also detailed how Lightspeed Capital "baits investors with its massive potential in its payments solution, but we believe it has not been transparent about competitive pressures and material margin decline," and concluded that "[n]ow a $17 billion company, we believe LSPD is crowding into Shopify's space, and will be forced to compete head-to-head with it, and new entrants such as Amazon."  As a result, Spruce Capital then surmised that Lightspeed Commerce "will lose the battle and its astronomical 23x 2022E sales

multiple will contract," resulting in an otherwise concealed "60%–80% downside risk to ($22.50 – $45.00 per share)."

8.      Lightspeed Commerce issued its own press release in response to the Spruce Capital Report that same day disputing certain of its findings, including emphasizing in pertinent part that the Company had "***consistently delivered revenue growth*** since its initial listing on the Toronto Stock Exchange in March 2019," and that its first quarter 2022 ("1Q22") "revenue[s] of $115.9M increased 220% from the prior year quarter ***with organic software and transaction-based revenue growth of 78%***."  Yet as to other of the report's specific findings, the Company's release simply stated, "The Company will not be providing further comment on the report at this time as it maintains its focus on building its business and delivering exceptional products and services for customers."

9.      The market price of Lightspeed Commerce common stock nonetheless plunged on these revelations, falling almost $14 a share from its close of $112.50 per share on September 28th to close down at $98.77 per share on September 29th, on unusually high volume of more than 7 million shares trading, or more than 6x the average daily volume over the preceding ten (10) trading days.

10.      Then on November 4, 2021, before the opening of trading, Lightspeed Commerce issued a press release announcing its second quarter 2022 ("2Q22") financial results for the interim period ended September 30, 2021.  While the Company's 2Q22 revenue grew 193% on a year-over-year basis to $133.2 million, a full half of that revenue came from new business acquisitions, while organic revenue in its core segments – subscriptions and transcriptions – grew ***a mere 58%*** - well below the 78% growth the Company had just touted on November 3rd in disputing the Spruce Capital Report findings.  More critically, the Company's guidance for the rest of its fiscal year 2022 ("FY22") demonstrated that its earlier revenue growth had indeed been driven primarily by the

acquisitions as the Spruce Capital Report had charged, and that those tailwinds were now rapidly fading. For its third quarter 2022 ("3Q22"), Lightspeed Commerce was now only forecasting revenues in the range of $140 million to $145 million – or *a paltry 7% sequential revenue growth*. And for FY22, the Company was now only guiding for revenues of $520 million to $535 million, implying *no sequential growth whatsoever* in the Company's fourth quarter 2022 ("4Q22").

11.     On this news – which confirmed the findings of the Spruce Capital Report and detailed the specific harm to the Company's financial results – the market price of Lightspeed Commerce common stock declined even further, falling more than $27 per share from its close of $98.97 per share on November 3, 2021 to close down at $71.36 per share on November 4, 2021, on unusually high trading volume of more than 13.5 million shares trading, or well more than fourteen times the average daily volume over the preceding ten trading days.

12.     As a result of Defendants' false statements, Lightspeed Commerce shares traded at inflated prices during the Class Period.  However, after the above revelations, the price of the Company's common stock was hammered by massive sales, sending it down more than 45% from the Class Period high.

## JURISDICTION AND VENUE

13.     Jurisdiction is conferred by §27 of the 1934 Act.  The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and SEC Rule 10b-5.

14.     Venue is proper here pursuant to §27 of the 1934 Act.  Many of the false and misleading statements were made in or issued from this District, and many of the acts and transactions giving rise to the violations of law complained of occurred here.  Lightspeed Commerce common stock is listed and trades on the NYSE which is located in this District and the Company's transfer agent and registrar for shares in the United States is American Stock Transfer & Trust Company, LLC, at its principal office in Brooklyn, New York.

15.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## THE PARTIES

16.     Plaintiff purchased Lightspeed Commerce common stock described in the attached certification and was damaged thereby.

17.     Defendant Lightspeed Commerce is a provider of commerce enabling Software as a Service ("SaaS") platforms for small and midsize businesses, retailers, restaurants, and golf course operators in Canada, the United States, Germany, Australia, and internationally.  The Company was formerly known as Lightspeed POS Inc. and formally changed its name to Lightspeed Commerce Inc. in August 2021.  Lightspeed Commerce was incorporated in 2005 and is headquartered in Montreal, Quebec, Canada.  Its common stock is listed and trades on the NYSE under the ticker symbol "LSPD."  As of March 31, 2021, Lightspeed Commerce had more than 128.5 million shares of common stock issued and outstanding, at least 13 million of which trade here in the U.S.

18.     Defendant Dasilva founded the Company and is, and at all relevant times was, the CEO of Lightspeed Commerce.

19.     Defendant Brandon Nussey ("Nussey") is, and at all relevant times was, Chief the Operations and Chief Financial Officer ("COO/CFO") of Lightspeed Commerce.

20.     Defendants Dasilva and Nussey (the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Lightspeed Commerce's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be

corrected.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, Dasilva and Nussey knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  Dasilva and Nussey are liable for the false statements pleaded herein at ¶¶27-32, 34, 38.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

21.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Lightspeed Commerce.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Lightspeed Commerce common stock was a success, as it: (i) deceived the investing public regarding Lightspeed Commerce's prospects and business; (ii) artificially inflated the prices of Lightspeed Commerce common stock; (iii) permitted Lightspeed Commerce to issue and Lightspeed Commerce and several of its senior executives and others to sell approximately 13 million shares of common stock in its IPO and to obtain a listing of those shares for resale on the NYSE; and (iv) caused Plaintiff and other members of the class to purchase Lightspeed Commerce common stock at artificially inflated prices.

## BACKGROUND

22.     Lightspeed Commerce operates cloud-based, omni-channel commerce-enabling SaaS platforms.  According to the Company, its software platforms allow its customers to engage with consumers, manage their operations and accept payments.  The Company operates globally permitting single- and multi-location retailers, restaurants and other small and medium sized businesses ("SMBs") to compete in an omni-channel market environment by engaging with consumers across online, mobile, social, and physical channels.  It offers service to 100,000+ retail, restaurant, and hospitality businesses, across 100 countries, though its actual customer count is unverified.

23.    The Company was founded by Defendant Dasilva in 2005, with its headquarters in Montreal, to provide point-of-sale and e-commerce software to retail businesses.  In 2014, it expanded its customer base to include the hospitality industry.  It now has its operations in North America and Europe.

24.    The Company's main sources of revenue are subscriptions for its platforms.  In addition, the Company generates revenue from payment processing services, payment residuals, professional services and sales of hardware.  It operates in a single business segment as follows:

- *Subscription revenue:* Software subscriptions and licenses include subscriptions to cloud-based solutions for both retail and hospitality platforms and for the Company's e-commerce offering.  In addition to the core subscriptions and licenses outlined above, customers can purchase add-on services such as loyalty, delivery, order anywhere, advanced reporting, accounting and analytics, amongst others.  Subscriptions include maintenance and support, which includes access to unspecified upgrades.

- *Transaction-based revenue:* The Company offers to its customers payment processing services, through connected terminals and online, that facilitate payment for goods and services sold by the customer to its consumers.  The Company's software also interfaces with third parties that enable credit card processing.  These companies generate revenue from charging transaction fees that are generally a fixed amount per transaction, or a fixed percentage of the transaction processed.  As part of integrating with the solutions of these payment processors, the Company negotiates a revenue share with most of them, whereby the Company receives a portion of the revenues generated by the payment processor.  In addition, the Company has contracted with a number of third-party vendors that sell products to the same merchant customers as does the Company.  The Company refers its merchant customers to these vendors and earns a referral fee.

- *Hardware and other revenue:* For retail, hospitality and e-commerce customers, the Company's software integrates with various hardware solutions required to operate a location.  As part of the sales process to both new and existing customers, the Company acts as a reseller of the hardware.  Such sales consist primarily of hardware peripherals. In addition, in some cases where customers would like assistance deploying the Company's software or integrating the Company's software with other systems or setting up their e-commerce store, the Company provides professional services customized to the merchant.

25.    The Company uses several financial metrics it refers to as "Key Performance Indicators" that it claims provide material information that investors should focus on, including:

- ***"Average Revenue Per User"*** or ***"ARPU,"*** which the Company claims represents the total subscription revenue and transaction-based revenues of the Company in the period divided by the number of [c]ustomer Locations of the Company in the period.

- ***"Customer Locations,"*** which the Company claims represents a billing customer location for which the term of services have not ended, or with which it is presently negotiating a renewal contract.  A single unique customer can have multiple Customer Locations including physical and eCommerce sites.  The Company claims to "believe that [its] ability to increase the number of Customer Locations served by [its] platform is an indicator of [its] success in terms of market penetration and growth of [its] business."

- ***GTV,*** which the Company claims represents "the total dollar value of transactions processed through [its] cloud-based [SaaS] platform in the period, net of refunds, inclusive of shipping and handling, duty and value-added taxes," adding that Lightspeed Commerce "believe[s] GTV is an indicator of the success of [its] customers and the strength of [its] platform," though conceding that "GTV does not represent revenue earned by us."

### DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS AND OMISSIONS

26.     The Class Period starts on September 11, 2020.  On or about September 9, 2020, Lightspeed Commerce filed a registration statement with the SEC on Form F-10, which after several amendments would be used to conduct the IPO.  On September 10, 2020, Lightspeed Commerce and its underwriters priced the IPO at $30.50 per share, and the shares began trading on the NYSE on September 11, 2020.  The IPO was completed on or about September 15, 2020, with Lightspeed Commerce issuing and selling 10,896,196 shares of its common stock for total gross proceeds of approximately $332.3 million, including 896,196 shares issued upon the partial exercise of the underwriters' over-allotment option, and certain selling shareholders selling 2,142,808 shares held by them the same day for gross proceeds of $65.4 million.  Defendant Dasilva and several other senior executives made certain of their personally-held shares available for sale in the IPO as part of the underwriter's over-allotment option.  The final registration statement and prospectus used to conduct the IPO (collectively, the "Registration Statement") contained materially false and misleading statements.

- 9 -

27.    Concerning the Company's "Growth Strategies," the Registration Statement stated that the Company "str[o]ve to grow [its] business both *organically* and through *strategic and value-enhancing acquisitions*."[1]  It further stated in pertinent part as follows:

- "Since our founding, we have successfully grown revenue by *increasing the number of [c]ustomer [l]ocations served*."

- "We continue to see *a large portion of our existing customers adopt additional modules* as they grow and, increasingly, see new customers opting to purchase multiple modules at the outset when first adopting our platform."

- "Our eCommerce platform has seen strong growth with an increasing number of our retail customers electing to use Lightspeed eCom to power their online selling. *We saw the GTV processed through our eCommerce platform increase by nearly 100% in the quarter ended June 30, 2020*, as compared to the same quarter a year prior."

- "Throughout our history, we have accrued significant sales and marketing expertise, which we leverage to facilitate our continued global expansion *both organically* and in integrating the companies we acquire."

28.    Concerning the Company's then present "Customers," the Registration Statement stated in pertinent part that "[a]s of June 30, 2020, [the Company's] customers collectively represented approximately *77,000 [c]ustomer [l]ocations* in over 100 countries and *generated average GTV in excess of US$600,000 annually*, which is reflective of the success of their businesses."

29.    On September 15, 2020, in addition to announcing that the IPO had been completed, the Company filed an "Independent auditor's report" with the SEC as part of a Current Report on Form 6-K.  That report stated in pertinent part that "[i]n our opinion, the accompanying consolidated financial statements present fairly, in all material respects, the financial position of [the Company] as at March 31, 2020 and 2019, and its financial performance and its cash flows for the years then

---

[1] All emphasis in quoted materials in the Complaint is added unless otherwise noted.

ended in accordance with International Financial Reporting Standards as issued by the International

Accounting Standards Board (IFRS)." It also represented that the outside audit firm had "conducted

[its] audit in accordance with Canadian generally accepted auditing standards" and that it "believe[d]

that the audit evidence [it had] obtained [was] sufficient and appropriate to provide a basis for [its]

opinion."

30.     On November 5, 2020, Lightspeed Commerce issued a press release announcing its

2Q21 financial results for the interim period ended September 30, 2020. In addition to quoting

Defendant Nussey stating in pertinent part that "[t]oday, we reported one of the most exceptional

quarters in the history of [Lightspeed Commerce], demonstrating not only that the business model is

working, but also our potential for the long-term" and that "[t]he digital transformation brought on

by the pandemic led to ***strong demand for new customer additions***, ***growing our customer location***

***count to over 80,000***," discussing the Company's then-present business metrics and financial

prospects, the release stated in pertinent part as follows:

- ***[Lightspeed Commerce's] customer base grew to over 80,000 locations***. Gross new customer location additions continues to be ***an encouraging metric and suggests a strong long-term outlook***. Gross new customer location additions were 68% higher than a year ago, and 26% higher than the first quarter of fiscal 2021[.]

  \*        \*        \*

- ***ARPU trends in the quarter were encouraging assisted predominately by Lightspeed Payments but also due to increased software module adoption***[.]

- ***GTV increased 56% over the same quarter last year to $8.5 billion in the quarter***, and by 25% when excluding the impact of the Kounta and Gastrofix acquisitions. Retail GTV grew 34%, with the proportion going through eCommerce increasing by 80% versus the prior year. Hospitality GTV grew by 97% due mainly to the impact of the acquisitions, and also the result of a strong rebound from the lows in April[.]

31.     On February 4, 2021, Lightspeed Commerce issued a press release announcing its

third quarter 2021 financial results for the interim period ended December 31, 2020. Discussing the

Company's then-present business metrics and financial prospects, the release stated in pertinent part as follows:

- *[Lightspeed Commerce's] customer base grew to almost 115,000 locations*, an increase of 74% year-over-year.

  \*       \*       \*

- Even excluding the positive impact from the ShopKeep and Upserve acquisitions *[Lightspeed Commerce's] ARPU increased from the previous quarter, due predominantly to increased payments revenue in the quarter and an increased portion of customer's adopting more than one software module*."

  \*       \*       \*

- *[Lightspeed Commerce] delivered GTV of $9.1B* up 48% year-over-year."

32.    On May 20, 2021, before the opening of trading, Lightspeed Commerce issued a press release announcing its fourth quarter and fiscal year 2021 financial results for the period ended March 31, 2021.  In addition to quoting Defendant Nussey stating in pertinent part that "[Lightspeed Commerce] had another record quarter with strong software growth and outstanding results from [its] payments offering" and that "[a]lthough [it] entered the quarter under challenging conditions as lockdown measures increased globally, [it] *saw strength in March* and [was] encouraged by the reopenings [seen] around the world," discussing the Company's then-present business metrics and financial prospects, the release stated in pertinent part as follows:

- *[Lightspeed Commerce's] customer locations grew to approximately 119,000*, an increase of 56% year-over-year. Gross location additions reached a record level in the quarter despite difficult macro-economic conditions.

  \*       \*       \*

- *ARPU increased year-over-year by 48% to $215*. The bulk of this ARPU improvement *came from transaction-based revenues largely due to the success of Lightspeed Payments*.

  \*       \*       \*

- For the quarter, *[Lightspeed Commerce] delivered GTV of $10.8 billion up 76% year-over-year*. Excluding our recent acquisitions, the Company continued to see strong growth in Retail with eCommerce growth of approximately 100% year-over-year and total omnichannel retail GTV growth of 65% year-over-year. Organic GTV growth was 25% year-over-year as hospitality continued to be challenged in the quarter. However, as markets re-open, the Company is seeing encouraging signs. For example, Australian merchants, which are predominantly hospitality merchants, saw strong year-over-year GTV growth of over 75% in the quarter.

33.     The market price of Lightspeed Commerce common stock spiked upward on this news, increasing more than 15% from its close of $57.44 per share on May 19, 2021 to close at $66.45 per share on May 20, 2021, on unusually high trading volume of more than 2.3 million shares trading, or more than two-and-half times the average daily trading over the preceding ten trading days.

34.     On August 5, 2021, before the opening of trading, Lightspeed Commerce issued a press release announcing its 1Q22 financial results for the interim period ended June 30, 2021.  The release quoted Defendant Dasilva stating in pertinent part that "[a]s economies reopen and new business creation accelerates, [Lightspeed Commerce's] one-stop commerce platform *is emerging as the technology of choice for retailers and restaurateurs the world over*" and Defendant Nussey stating in pertinent part that "[Lightspeed Commerce] achieved outstanding results this quarter *as demand for both our software and payments solutions were bolstered by economies reopening around the world*" and that "[t]he momentum we experienced in March *continued into our fiscal Q1 as our customers experienced a strong recovery which helped accelerate our GTV growth*." Discussing the Company's then-present business metrics and financial prospects, the release stated in pertinent part as follows:

- *ARPU increased year-over-year by 44% to over $230*.

* * *

- 13 -

- . . . . the growing number of ***Customer Locations, which numbered over 150,000 at the end of the quarter***, an increase of 95% year-over-year.

*        *        *

- For the quarter, [Lightspeed Commerce] delivered ***GTV of $16.3 billion*** up 203% year-over-year. ***Organic GTV growth was 91% year-over-year***.

35.     The market price of Lightspeed Commerce common stock again spiked upward on this news, increasing more than 7% from its close of $89.17 per share on August 4, 2021 to close at $95.76 per share on August 5, 2021, on unusually high trading volume of more than 1.6 million shares trading, or three times the average daily trading over the preceding ten trading days.

36.     The true facts, which were then known to or recklessly disregarded by the Defendants and were concealed from the investing public during the Class Period, were:

(a)     that Lightspeed Commerce had overstated its pre-IPO business metrics and financial prospects by overstating its true customer count by 85%;

(b)     that Lightspeed Commerce had overstated its pre-IPO business metrics and financial prospects by overstating its true GTV – a payment volume metric that a former employee described as "smoke and mirrors" – by 10%;

(c)     that Lightspeed Commerce was then overstating its business metrics and financial prospects by concealing declining organic growth and ongoing business deterioration;

(d)     that Lightspeed Commerce was then overstating its business metrics and financial prospects by claiming that its ARPU was increasing;

(e)     that Lightspeed Commerce had undertaken an acquisition spree at escalating costs with no clear path to profitability, while its management pursued aggressive revenue reporting practices; and

(f)     that Defendants had been operating the Company with defective internal controls and ineffective oversight of its accounting practices by its outside audit firm.

37.     On September 29, 2021, during the trading day, Spruce Point published the Spruce Point Report – replete with troves of evidence and summaries of interviews with Lightspeed Commerce employees based on its extensive investigation – along with a press release summarizing the Spruce Point Report.  As summarized in the press release, the Spruce Point Report's detailed finding included:

- **Evidence shows that [Lightspeed Commerce] massively inflated its business pre-IPO, overstating its customer count by 85% and [GTV] by 10% – a payment volume metric that a former employee described as "smoke and mirrors."** Spruce Point's research shows that [Lightspeed Commerce's] business was stalling pre-IPO and that as early as 2014, GTV overstatement was identified and revisions were made to reduce GTV by ~$1.5 billion. We question why [Lightspeed Commerce] reported "50,000+" customers up through November 2018, and then ceased customer count disclosures to investors when coming public in March 2019? In our view, the Company might have shifted the narrative from customers to locations in an attempt to conceal a materially inflated customer count or an undisclosed material adverse event involving customer loss.

- **Evidence of declining organic growth and business deterioration through [Lightspeed Commerce's] IPO, despite management's claims that Average Revenue Per User ("ARPU") is increasing.** [Lightspeed Commerce's] income statement disclosures make it difficult to determine organic revenue growth, but our research shows that hardware margins have recently turned negative and deferred revenue quality has deteriorated. Hardware sales, formerly a profit center where [Lightspeed Commerce] received upfront payments from customers for long-term software contracts, is now a cost center for [Lightspeed Commerce] while competition gives hardware away for free. An interview with a former employee that spent five years at the Company revealed that "ARPU as a whole dropped significantly." We question why has [Lightspeed Commerce] revised its ARPU definition three times and never disclosed a decline in ARPU despite acquiring businesses with lower ARPUs? Also curiously, [Lightspeed Commerce] initially told investors that operating cash flow was the best way to measure its growth, but quickly suspended its cash flow guidance the following quarter and failed to promptly call out the change to investors.

- **Recent acquisition spree has come at escalating costs with no clear path to profitability, while management pursues aggressive revenue reporting practices.** By backing out Q3 2021 acquisition contributions to deferred revenue and receivables, we find evidence of double-digit organic decline. This contrasts with [Lightspeed Commerce's] claims of 42% organic software and payments revenue growth in its core business. At its IPO,

[Lightspeed Commerce's] prospectus promoted a Total Addressable Market ("TAM") of $113 billion to grow to $542 billion. Yet, after $2.5 billion spent on acquisitions since its IPO, and claims of increasing its ARPU, its recent prospectus showed a current TAM of just $16 billion (85% less). [Lightspeed Commerce] also appears to have loosened its revenue recognition disclosure post-IPO to allow for earlier recognition. There is evidence of a revenue restatement post-IPO (along with COGS revisions), without explanation. Revenues barely went down during peak COVID-19 shutdowns, while other peers in the retail and hospitality POS businesses saw revenues decline by 20% and DSOs worsen.

- **Weak governance standards and worrisome auditor oversight by PwC under a concerning CFO, who was tied to a prior technology roll-up scandal.** In light of multiple financial anomalies in [Lightspeed Commerce's] reporting, Spruce Point questions why the Company hired CFO [Nussey] – an executive with financial scandal and turnaround experience – to lead it through an IPO into the public markets. [Nussey] failed to make clear on his biography that he held a senior operating role at Descartes Systems Group (a troubled software roll-up company) before becoming CFO when it restated financial results and took asset impairment charges. We also find it troublesome that the Board ties the CEO's compensation to "target payment customers" despite never disclosing this key metric to investors. We also question why immediately after its IPO and a period of substantial acquisitive growth, [Lightspeed Commerce] added a clawback provision, and switched its PwC audit partner from an expert in technology to one that specializes in entertainment, media & communications?

- **[Lightspeed Commerce] commands a premium multiple of 23x and 47x 2022E sales and gross profit despite its substandard financial reporting quality, and inability to generate positive EBITDA margins or cash flow 16 years after it was founded.** The Company is positioned by its stock promoters as a best-of-breed commerce technology solutions provider. However, we believe the promoters have taken [Lightspeed Commerce's] story at face value without conducting a rigorous forensic review of its financial claims, accounting policies, and acquisition history. It appears that the majority of price targets (the average target is $120.70/share) are based on financials currently inflated by a rapid sequence of acquisitions that [Lightspeed Commerce] has yet to fully digest and prove it can extract value from. Promoters give it full credit for seamless integration of each business despite our findings that most of the recent acquisitions have been plagued by growth issues and were very expensive. As one former employee told us, "They are very good at PR, and saying we're going to acquire this, this, this, but I don't know if there will be a breaking point where all these acquisitions are not going to play well together. It looks great on paper but when you go into practice, how is this going to operate beyond just numbers on a PR deck?" **<u>Once investors come to grips with reality and reassess the quality</u>**

**of its business, Spruce Point expects [Lightspeed Commerce's] share price to decline by 60%-80%.**

38.     Lightspeed Commerce issued its own press release in response to the Spruce Capital Report that same day disputing certain of its findings, including emphasizing in pertinent part that the Company had "consistently delivered revenue growth since its initial listing on the Toronto Stock Exchange in March 2019," and that its 1Q22 "revenue[s] of $115.9M increased 220% from the prior year quarter ***with organic software and transaction-based revenue growth of 78%***." As to other of the report's specific findings, the Company's release simply stated, "[t]he Company will not be providing further comment on the report at this time as it maintains its focus on building its business and delivering exceptional products and services for customers."

39.     The market price of Lightspeed Commerce common stock nonetheless plunged on these revelations, falling almost $14 a share from its close of $112.50 per share on September 28th to close down at $98.77 per share on September 29th, on unusually high volume of more than 7 million shares trading, or more than 6x the average daily volume over the preceding 10 trading days.

40.     Then on November 4, 2021, before the opening of trading, Lightspeed Commerce issued a press release announcing its 2Q22 financial results for the interim period ended September 30, 2021. While the Company's 2Q22 revenue grew 193% on a year-over-year basis to $133.2 million, a full half of that revenue came from new business acquisitions, while organic revenue in its core segments – subscriptions and transcriptions – grew ***a mere 58%*** - well below the 78% growth the Company had just touted on November 3rd in disputing the Spruce Capital Report findings. More critically, the Company's guidance for the rest of its FY22 demonstrated that its earlier revenue growth had been driven primarily by the acquisitions as the Spruce Capital Report had charged, and that those tailwinds were now rapidly fading. For its 3Q22, Lightspeed Commerce was now only forecasting revenues in the range of $140 million to $145 million – or ***a paltry 7%***

*sequential revenue growth*.  And for FY22, the Company was now only guiding for revenues of $520 million to $535 million, implying ***no sequential growth whatsoever*** in the Company's 4Q22.

41.     On this news – which confirmed the findings of the Spruce Capital Report and detailed the specific harm to the Company's financial results – the market price of Lightspeed Commerce common stock declined even further, falling more than $27 per share from its close of $98.97 per share on November 3, 2021 to close down at $71.36 per share on November 4, 2021, on unusually high trading volume of more than 13.5 million shares trading, or well more than fourteen times the average daily volume over the preceding ten trading days.

42.     Stock analysts took notice of the decline in Lightspeed Commerce's revenue guidance with analysts at Barclays reducing their price target from $137 a share to $123 a share, analysts at Raymond James decreasing their price target from $140 a share to $110 a share and analysts at CIBC reducing their price target from $190 per share to $125 per share.

43.     As a result of Defendants' false statements, Lightspeed Commerce shares traded at artificially inflated prices during the Class Period.  However, after the above revelations, the price of the Company's common stock was hammered by massive sales, sending it down nearly 45% from its Class Period high.

### ADDITIONAL SCIENTER ALLEGATIONS

44.     As alleged herein, Lightspeed Commerce and the Individual Defendants acted with scienter in that they: knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth herein in detail, these Defendants, by virtue of their receipt of information reflecting the true facts regarding Lightspeed Commerce, their

control over, and/or receipt and/or modification of Lightspeed Commerce's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Lightspeed Commerce, participated in the fraudulent scheme alleged herein.

## NO SAFE HARBOR

45.     The "Safe Harbor" warnings accompanying Lightspeed Commerce's reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with GAAP, including those filed with the SEC on Form 6-K, they are excluded from the protection of the statutory Safe Harbor.  *See* 15 U.S.C. §78u-5(b)(2)(A).

46.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Lightspeed Commerce who knew that the FLS was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## LOSS CAUSATION AND ECONOMIC LOSS

47.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Lightspeed Commerce common stock and operated as a fraud or deceit on purchasers of Lightspeed Commerce

common stock.  As detailed above, when the truth about Lightspeed Commerce's misconduct was revealed, the value of Lightspeed Commerce's common stock declined precipitously as the prior artificial inflation no longer propped up the share price.  The decline in the price of Lightspeed Commerce common stock was the direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the share price decline negate any inference that the losses suffered by Plaintiff and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Lightspeed Commerce common stock and the subsequent significant decline in the value of Lightspeed Commerce common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

48.     At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by Plaintiff and other Class members.  Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Lightspeed Commerce's business, operations and financial results as alleged herein.  Throughout the Class Period, Defendants issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing the price of Lightspeed Commerce common stock to be artificially inflated.  Plaintiff and other Class members purchased Lightspeed Commerce common stock at those artificially inflated prices, causing them to suffer damages as complained of herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

49. Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

50. Plaintiff and the Class are also entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) and the fraud-on-the-market doctrine because the market for Lightspeed Commerce common stock was an efficient market at all relevant times by virtue of the following factors, among others:

(a) Lightspeed Commerce common stock met the requirements for listing, and was listed and actively traded on NYSE, a highly efficient market;

(b) Lightspeed Commerce regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(c) Lightspeed Commerce was followed by a number of securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. These reports were publicly available and entered the public marketplace.

51. As a result of the foregoing, the market for Lightspeed Commerce common stock promptly incorporated current information regarding the Company from publicly available sources and reflected such information in the prices of the common stock. Under these circumstances, all those who transacted in Lightspeed Commerce common stock during the Class Period suffered

- 21 -

similar injury through their transactions in Lightspeed Commerce common stock at artificially inflated prices and a presumption of reliance applies.

52.     Without knowledge of the misrepresented or omitted material facts, Plaintiff and other Class members purchased or acquired Lightspeed Commerce common stock between the time Defendants misrepresented and failed to disclose material facts and the time the true facts were disclosed.  Accordingly, Plaintiff and other Class members relied, and are entitled to have relied, upon the integrity of the market prices for Lightspeed Commerce common stock, and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

## CLASS ACTION ALLEGATIONS

53.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Lightspeed Commerce common stock during the Class Period (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

54.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Lightspeed Commerce has over 128.5 million shares issued outstanding, owned by hundreds if not thousands of persons.

55.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

    (a)     whether the 1934 Act was violated by Defendants;

(b)      whether Defendants omitted and/or misrepresented material facts;

(c)      whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)      whether Defendants knew or deliberately disregarded that their statements were false and misleading;

(e)      whether the prices of Lightspeed Commerce common stock were artificially inflated; and

(f)      the extent of damage sustained by Class members and the appropriate measure of damages.

56.      Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

57.      Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

58.      A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

59.      Plaintiff incorporates ¶¶1-58 by reference.

60.      During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

61.   Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)   employed devices, schemes and artifices to defraud;

(b)   made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)   engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Lightspeed Commerce shares during the Class Period.

62.   Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Lightspeed Commerce shares.  Plaintiff and the Class would not have purchased Lightspeed Commerce shares at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

63.   Plaintiff incorporates ¶¶1-62 by reference.

64.   The Individual Defendants acted as controlling persons of Lightspeed Commerce within the meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company, and their ownership of Lightspeed Commerce stock, the Individual Defendants had the power and authority to cause Lightspeed Commerce to engage in the wrongful conduct complained of herein.

65.   Lightspeed Commerce controlled the Individual Defendants and all of its employees.

66.   By reason of such conduct, Defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.      Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23 and

appointing Plaintiff as a lead plaintiff and approving his selection of lead counsel;

B.      Awarding Plaintiff and the members of the Class damages, including interest;

C.      Awarding Plaintiff's reasonable costs and attorneys' fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and

proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED:  December 3, 2021                      **JOHNSON FISTEL, LLP**

                                              */s/ Ralph M. Stone*
                                              Ralph M. Stone
                                              1700 Broadway, 41st Floor
                                              New York, NY 10019
                                              Telephone: (212) 292-5690
                                              Facsimile: (212) 292-5680
                                              RalphS@johnsonfistel.com

                                              **JOHNSON FISTEL, LLP**
                                              Michael I. Fistel, Jr.
                                              40 Powder Springs Street
                                              Marietta, GA 30064
                                              Telephone: (470) 632-6000
                                              Facsimile: (770) 200-3101
                                              MichaelF@johnsonfistel.com

                                              ***Counsel for Plaintiff***

- 25 -

**CERTIFICATION OF PLAINTIFF PURSUANT
TO THE FEDERAL SECURITIES LAWS**

I, Peter Pappas, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.      I have reviewed the complaint and authorize its filing.

2.      I did not acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.      I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4.      I made the following transactions during the Class Period in the securities that are the subject of this action.

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 9/17/2021 | 150 | $125.84 |
| | | |

**Sales:**

| Date Sold | Number of Shares Sold | Selling Price Per Share |
|---|---|---|
| 10/18/2021 | 150 | $95.19 |
| | | |

5.      I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

DocuSign Envelope ID: 52954D47-E5C6-4CB9-A9E3-14C06E1410C3

6.      I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years, except if detailed below:

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: 11/18/2021

DocuSigned by:

*Peter Pappas*

66655B6725204D1...

Peter Pappas